**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| Kenneth D. Alpart, et al, | : |
| | : |
| Plaintiffs, | : |
| | : |
| v. | : Civil Action No. 07-4457 (AB) |
| | : |
| General Land Partners, Inc., et al, | : |
| | : |
| Defendants. | : |

## <u>ORDER</u>

AND NOW, this _____ day of _____ 2010, upon consideration of the motion for partial summary judgment filed by Plaintiffs Kenneth D. Alpart, Lynette Kerrane and Eric Wojcikiewicz as Trustees of the GST Non-Exempt QTip Marital Trust, and Lynette Kerrane individually (collectively, "Plaintiffs"), the memorandum in support thereof, and the response submitted thereto, it is hereby ORDERED that:

(i)     the motion is GRANTED;

(ii)    with respect to Count I of the Amended Complaint, judgment is entered in favor of Plaintiffs and against Defendants General Land Partners, Inc., Tracy Mignatti as Executrix for the Estate of Theophile J. Mignatti, III, and Theophile J. Mignatti, Jr.;

(iii)   with respect to Count II of the Amended Complaint, judgment is entered in favor of Plaintiffs and against Defendant Tracy Mignatti as Executrix for the Estate of Theophile J. Mignatti, III;

(iv)    with respect to Count III of the Amended Complaint, judgment is entered in favor of Plaintiffs and against General Land Partners, Inc., Tracy Mignatti as Executrix for the Estate of Theophile J. Mignatti, III, and Theophile J. Mignatti, Jr.;

(v)     with respect to Count IV of the Amended Complaint, judgment is entered in favor of Plaintiffs and against Steve McKenna, General Land Partners, Inc., Creek Road Development Group, L.P. and Creek Road Development Group, Inc.;

(vi)     with respect to the counterclaim set forth in Count II of Defendants' Answer to Amended Complaint with Affirmative Defenses and Counterclaims, judgment is entered in favor of Plaintiffs and against all defendants;

(vii)     Plaintiffs are entitled to twenty-five percent (25%) of any and all "building profits" that flow from the development of the Bucks County Land, and Defendants shall distribute such profits directly to Plaintiffs rather than to LC Associates, L.P.; and

(viii)    a hearing to determine damages will be held on _____, 2010.


BY THE COURT:


_____
Brody, J.

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| Kenneth D. Alpart, et al, | : |
| | : |
| Plaintiffs, | : |
| | : |
| v. | : Civil Action No. 07-4457 (AB) |
| | : |
| General Land Partners, Inc., et al, | : |
| | : |
| Defendants. | : |

## PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, Plaintiffs Kenneth D. Alpart, Lynette Kerrane and Eric Wojcikiewicz as Trustees of the GST Non-Exempt QTip Marital Trust, and Lynette Kerrane individually, by their undersigned counsel, hereby move for partial summary judgment for the reasons set forth in the accompanying Memorandum of Law, and in the Appendix thereto, all of which are incorporated herein by reference. Specifically, Plaintiffs seek entry of summary judgment in their favor as to liability with respect to Counts I through IV and Count VIII of the Amended Complaint, and against defendants with respect to Counterclaim II of Defendants' Answer to Amended Complaint with Affirmative Defenses and Counterclaims.

WHEREFORE, Plaintiffs respectfully ask that judgment be entered for them as set forth in the attached proposed order.


Date:   February 26, 2010

/s/ Stephen J. Kastenberg
Stephen J. Kastenberg
Jeffrey S. Rosenblum
Amy Shellhammer
Pa. ID Nos. 70919, 28809 & 91804
kastenberg@ballardspahr.com
rosenblumjs@ballardspahr.com
shellhammera@ballardspahr.com
BALLARD SPAHR LLP
1735 Market Street, 51st Floor
Philadelphia, PA 19103
(215) 665-8500 (phone)
(215) 864-8999 (facsimile)

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| Kenneth D. Alpart, et al, | : | |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | Civil Action No. 07-4457 (AB) |
| | : | |
| General Land Partners, Inc., et al, | : | |
| | : | |
| Defendants. | : | |

## PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF
## THEIR MOTION FOR PARTIAL SUMMARY JUDGMENT

BALLARD SPAHR LLP

Stephen J. Kastenberg
Jeffrey S. Rosenblum
Amy Shellhammer
1735 Market Street, 51st Floor
Philadelphia, PA 19103
(215) 665-8500 (phone)
(215) 864-8999 (facsimile)

*Attorneys for Plaintiffs*

# TABLE OF CONTENTS

**Page**

I.  INTRODUCTION ................................................................................ 1

II.  BACKGROUND ................................................................................ 3

    A.  The Undisputed Facts .............................................................. 3

    B.  The Causes Of Action ............................................................ 16

III.  LEGAL STANDARD APPLICABLE TO MOTIONS FOR SUMMARY
JUDGMENT ................................................................................... 17

IV.  ARGUMENT .................................................................................. 18

    A.  Tracy Mignatti Is Liable For Breach Of The Bucks County Agreement. ........... 19

        1.  The Bucks County Agreement Was A Valid And Binding
Contract. ................................................................... 19

        2.  The Bucks County Agreement Was Breached When The Land
Was Transferred For Less Than Fair Market Value. ................ 21

        3.  Defendants Intend To Further Breach The Bucks County
Agreement By Reducing Plaintiffs' Share of Any Building Profits ........ 23

    B.  General Land Partners, Tracy Mignatti, and Ted Mignatti, Jr. Breached
Fiduciary Duties Owed to Plaintiffs. .......................................... 25

        1.  The Count I Defendants Owed A Fiduciary Duty To Plaintiffs. .......... 26

        2.  The Count I Defendants Breached Their Fiduciary Duty To
Plaintiffs. .................................................................. 28

    C.  General Land Partners, Tracy Mignatti, And Ted Mignatti, Jr. Are Liable
For Breach Of The LC Agreement. ............................................ 31

        1.  The Count III Defendants Were Bound By The Terms Of The LC
Agreement. ................................................................ 31

        2.  The Count III Defendants Breached The LC Agreement. .............. 32

    D.  McKenna And The Corporate Defendants Tortiously Interfered With The
Bucks County Agreement. ...................................................... 33

        1.  Alpart, Dan Kerrane and Ted Mignatti, III, Were Parties To The
Bucks County Agreement. ............................................... 33

2.      The Count IV Defendants Tortiously Interfered With The Bucks County Agreement And Did So Without Justification. ........................... 35

E.      Plaintiffs Are Entitled To A Declaration That They Should Receive 25% Of Any Building Profits When Such Profits Are Realized.................................. 37

F.      The Undisputed Facts Fail To Establish That Plaintiffs Breached Any Covenant Of Good Faith And Fair Dealing......................................................... 38

V.      CONCLUSION............................................................................................................ 40

## <u>TABLE OF AUTHORITIES</u>

### FEDERAL CASES

<u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242 (1986)................................................................17

<u>CRS Auto Parts, Inc. v. Nat'l Grange Mut. Ins. Co.</u>, 645 F. Supp. 2d 354 (E.D. Pa. 2009) .........38

<u>Fireman's Ins. Co. v. DuFresne</u>, 676 F.2d 965 (3d Cir. 1982)................................................17, 23

<u>Flynn v. Health Advocate, Inc.</u>, No. 03-3764, 2004 WL 41929 (E.D. Pa. Jan. 13, 2004) ...........33

<u>Geddes v. Anaconda Copper Mining Co.</u>, 254 U.S. 590 (1921) ..................................................27

<u>Haymond v. Lundy</u>, No. 99-5015, 2000 WL 804432 (E.D. Pa. June 22, 2000)...........................25

<u>Jersey Cent. Power & Light Co. v. Lacey Twp.</u>, 772 F.2d 1103 (3d Cir. 1985) ..........................17

<u>McDermott v. Party City Corp.</u>, 11 F. Supp. 2d 612 (E.D. Pa. 1998) ..........................................25

<u>Nieves v. Hess Oil Virgin Islands Corp.</u>, 819 F.2d 1237 (3d Cir. 1987)................................17, 23

<u>Philadelphia Fed. Of Teachers v. Ridge</u>, No. 96-8051, 1997 WL 364397
(E.D. Pa. June 20, 1997) .............................................................................................................37

<u>Simon Wrecking Co., Inc. v. AIU Ins. Co.</u>, 350 F. Supp. 2d 624 (E.D. Pa. 2004) ......................25

<u>United States ex rel Wilhelm v. Chain</u>, 300 U.S. 31 (1937)........................................................19

<u>Valley Forge Convention Center & Bureau v. Visitor's Servs., Inc.</u>, 28 F. Supp. 2d 947
(E.D. Pa. 1998)............................................................................................................................37

### STATE CASES

<u>Aikens v. Baltimore & Ohio R.R. Co.</u>, 501 A.2d 277 (Pa. Super. Ct. 1985) ................................37

<u>Bigelow/Diversified Secondary P'ship Fund v. Damson/Birtcher Partners</u>, No. 16630,
2001 WL 1641239 (Del. Ch. Dec. 4, 2001)................................................................................26

<u>Brindley v. Woodland Village Restaurant</u>, 652 A.2d 865 (Pa. Super. 1995) ...............................27

<u>Clement v. Clement</u>, 260 A.2d 728 (Pa. 1970)............................................................................25

<u>Corestates Bank, N.A. v. Cutillo</u>, 723 A.2d 1053 (Pa. Super. Ct. 1999)......................................19

<u>DeMarchis v. D'Amico</u>, 637 A.2d 1029 (Pa. Super. Ct. 1994)....................................................19

<u>Donahue v. Fed. Express Corp.</u>, 753 A.2d 238 (Pa. Super. Ct. 2000)..........................................38

eToll, Inc. v. Elias/Savion Advertising, Inc., 811 A.2d 10 (Pa. Super. Ct. 2002) ........................37

F&M Schaeffer Brewing Co. v. Lehigh County Bd. of Appeals, 610 A.2d 1 (Pa. 1992) ............22

Jackson v. Bd. Of Assessment Appeals, 950 A.2d 1081 (Pa. Commw. Ct. 2008) .......................21

Jarl Investments, L.P. v. Fleck, 937 A.2d 1113 (Pa. Super. Ct. 2007) ..........................................25

Kaplan v. Cablevision of Pa., Inc., 671 A.2d 716 (Pa. Super. Ct. 1996)................................32, 33

Raiken v. Mellon, 582 A.2d 11 (Pa. Super. Ct. 1990) ............................................................24, 35

Smith v. VanGorkom, 488 A.2d 858 (Del. 1985)........................................................................27

Trombetta v. Raymond James Fin. Servs., Inc., 907 A.2d 550 (Pa. Super. Ct. 2006).......23, 24, 35

Wallace v. Wood, 752 A.2d 1175 (Del. Ch. 1999)........................................................................26

Wicks v. Milzco Builders, Inc., 470 A.2d 86 (Pa. 1983)........................................................27, 32

Wurtzel v. Park Town Place Apartments Ltd. P'ship, No. 3511, 2001 WL 1807405
(Pa. Ct. C.P. Sept. 11, 2001) ........................................................................................................27

## STATUTES AND RULES

Fed. R. Civ. P. 56(c) ....................................................................................................................17

15 Pa. Cons. Stat. Ann. § 8334 ....................................................................................................25

15 Pa. Cons. Stat. Ann. § 8533 ....................................................................................................25

## MISCELLANEOUS SOURCES

Black's Law Dictionary (7th ed. 1999)........................................................................................22

4 Corbin on Contracts § 17.12 (1997) ........................................................................................19

Webster's Ninth New Collegiate Dictionary (1988) ....................................................................22

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| Kenneth D. Alpart, et al, | : |
| | : |
| Plaintiffs, | : |
| | : |
| v. | : Civil Action No. 07-4457 (AB) |
| | : |
| General Land Partners, Inc., et al, | : |
| | : |
| Defendants. | : |

**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF
THEIR MOTION FOR PARTIAL SUMMARY JUDGMENT**

Plaintiffs Kenneth D. Alpart ("Alpart"), Lynette Kerrane and Eric Wojcikiewicz as Trustees of the GST Non-Exempt QTip Marital Trust, and Lynette Kerrane individually (collectively, "Plaintiffs"), through their undersigned counsel, respectfully present this memorandum of law in support of their motion for partial summary judgment.  Plaintiffs ask that the Court award them partial summary judgment as to liability with respect to five of their claims and schedule a damages hearing.  Additionally, Plaintiffs ask that the Court enter summary judgment for Plaintiffs and dismiss one of Defendants' counterclaims.[1]

## I.      INTRODUCTION

Plaintiffs instituted this action on October 24, 2007 to secure a declaration of their rights under two relevant contracts among the parties and to recover damages from Defendants, who have wrongfully acted to deprive them of millions of dollars in profits from a real estate venture in which they are invested.  On January 17, 2008, Plaintiffs filed an Amended Complaint

---

[1]      Defendants are General Land Partners, Inc. ("General Land Partners"), Creek Road Development Group, L.P.("Creek Road Partnership"), Creek Road Development Group, Inc. ("Creek Road Corporation"), Tracy Mignatti as Executrix of the Estate of Theophile J. Mignatti III, Theophile J. Mignatti, Jr. ("Ted Mignatti, Jr."), and Steve McKenna ("McKenna") (collectively, "Defendants").

asserting causes of action against Defendants for breach of fiduciary duty, breach of contract, tortious interference with contract, civil conspiracy, unjust enrichment, declaratory judgment, and for an accounting.

Following the disposition of Defendants' Motion to Dismiss the Amended Complaint and a related Motion for Reconsideration filed by Plaintiffs, virtually all claims set forth in the Amended Complaint were permitted to proceed through discovery.[2]  In light of the discovery conducted in this matter – including, most importantly, Defendants' own documents and the depositions of defendants McKenna and Ted Mignatti, Jr.[3] – no genuine issues of material fact exist with respect to the claims described in Counts I through IV and Count VIII of the Amended Complaint, as well as Count II of Defendants' Answer to Amended Complaint with Affirmative Defenses and Counterclaims.

Accordingly, and for the reasons more fully set forth below, summary judgment should be entered against the appropriate Defendants with respect to the claims alleged in Counts I through IV of the Amended Complaint, and Count II of Defendants' Counterclaim.

---

[2]      In their Motion to Dismiss, Defendants argued, inter alia, that the breach of contract claims alleged against Tracy Mignatti in her individual capacity should be dismissed. See Defs.' Mot. to Dismiss Pls.' Am. Compl., doc. no. 20, at pp. 12-13.  In that regard, Defendants' Motion was granted, and the claims at issue only remain against Tracy Mignatti in her capacity as Executrix of her late husband's estate.  See Aug. 19, 2008 Order, doc. no. 51, at p. 27.  Accordingly, any references to Tracy Mignatti made throughout this Memorandum of Law are to her in her capacity as Executrix of Ted Mignatti, III's estate.

[3]      McKenna was deposed not only in his capacity as a named defendant to this action, but as the Fed. R. Civ. P. 30(b)(6) representative of defendants General Land Partners, Creek Road Partnership, and Creek Road Corporation.  See McKenna dep., Ex. 1 at p. 282 line 23 – p. 283 line 17.  As such, his admissions bind the corporate defendants as well as himself.

## II.     BACKGROUND

### A.     The Undisputed Facts

*The Terms of the Bucks County Agreement*

1.      In or around August 1994, Alpart, Daniel M. Kerrane, Jr. ("Dan Kerrane") and Theophile J. Mignatti III ("Ted Mignatti III") entered into an oral agreement to acquire and potentially develop certain parcels of land in Warwick Township, Bucks County, Pennsylvania (the "Bucks County Land" and the "Bucks County Agreement").[4]  (Ex. 6 at p. 4 no. 6).[5]

2.      When they entered into the Bucks County Agreement, Alpart, Dan Kerrane and Ted Mignatti III were personal friends.  (Ted Mignatti dep., Ex. 2 at p. 15 lines 5-15; Tracy Mignatti dep., Ex. 3 at p. 29 line 11 – p. 31 line 1).

3.      When Alpart, Dan Kerrane and Ted Mignatti III entered into the Bucks County Agreement, Ted Mignatti III and his father, Ted Mignatti Jr., were engaged in a real estate development business known as Mignatti Companies ("Mignatti").  (Defs.' Answer to Am. Compl. with Affirmative Defenses & Countercls. [hereinafter, "Answer"], doc. no. 57, Countercls. ¶¶ 1-2).

4.      The Bucks County Agreement provided, *inter alia*, that Alpart and Dan Kerrane were to invest capital to cover the initial up front acquisition costs of the Bucks County

---

[4]      Defendants contend that defendant Theophile J. Mignatti, Jr. ("Ted Mignatti Jr.") was also a party to the Bucks County Agreement, a fact that Plaintiffs dispute, but which does not affect the outcome of this motion.  In any event, it is undisputed that the principal discussions which led to the agreement were between and among Ted Mignatti III, Alpart and Dan Kerrane.  (McKenna dep., Ex. 1 at p. 74, lines 12-22; Ted Mignatti dep., Ex. 2 at p. 30 lines 9-19).

[5]      Exhibit references are to the Appendix in Support of Plaintiffs' Motion for Partial Summary Judgment.

Land, in exchange for which they would receive: (i) a return of their capital contributions; (ii) fifty percent (50%) of the "land profits" (twenty-five percent (25%) each) from the resale of the land; and (iii) and twenty-five percent (25%) of any "building profits" (twelve and one-half percent (12.5%) each) if the land were resold for development to a Mignatti related entity. (Ted Mignatti dep., Ex. 2 at p. 25 lines 8-15; id. at p. 26 line 24 – p. 28 line 7; id. at p. 29 line 24 – p. 30 line 8).

5.     Under the terms of the Bucks County Agreement, a limited partnership was to be formed to purchase, hold, and subsequently resell the Bucks County Land (defined below as the "LC Partnership"). (Answer, Countercls. ¶¶ 8 & 12).

6.     The land in question was not purchased directly. Rather, the LC Partnership was to purchase from the Resolution Trust Corporation ("RTC") a mortgage then in default and foreclose upon the land. (Ted Mignatti dep., Ex. 2 at p. 34, lines 8-18).

7.     Ted Mignatti III, with the involvement of Ted Mignatti Jr. as Ted III saw fit, was to act as the operating partner of LC Partnership, and also to invest some funds as set forth below.[6] (McKenna dep., Ex. 1 at p. 38, lines 6-16; Ex. 7 at pp. 5-6).

8.     The material terms of the Bucks County Agreement were confirmed in an August 9, 1994 letter from Ted Mignatti III to Alpart and Dan Kerrane (the "August 9, 1994 letter"). (Ex. 8; Ex. 9 at § 4(e)(i)(2); Ted Mignatti dep., Ex. 2 at p. 25 line 2 – p. 28 line 7).

---

[6]     Defendants assert that Ted Mignatti Jr. was always to be involved and was a party to the Bucks County Agreement. This disputed fact is immaterial, as all of the parties agree that Ted Mignatti Jr. was involved, but also that the principal discussions setting the agreement and during the course of the agreement prior to Ted Mignatti III's death were

(continued...)

9.      The material terms of the Bucks County Agreement were also set forth in another document, also authored by Ted Mignatti III, that seems to slightly pre-date the August 1994 letter, entitled "Issues on RTC Acquisition-Warwick Greens" ("Warwick Greens Document").  (Ex. 10 at § 1.3).  Like the August 1994 letter, Ted Mignatti III drafted the Warwick Greens Document.  (Answer, Countercls. ¶ 11.).

10.      Under the terms of the Bucks County Agreement, as memorialized in the August 9, 1994 letter, the investment of funds and land development was to occur in three phases.  (Ex. 8; Ex. 10 at § 1.3).

a)      First, with respect to the acquisition from RTC of the mortgage for foreclosure, the cost of which was known to be $1.26 million, Kerrane and Alpart were responsible.  Accordingly, the August 1994 letter stated:  "Kerrane and Alpart are responsible for all up front acquisition costs, $1,260,000" (Ex. 8; Ex. 10 at § 1.3.4; Ted Mignatti dep., Ex. 2 at p. 25, lines 8-15);

b)      Second, costs incurred from the acquisition of the mortgage through foreclosure and titling of the land were to be split, with Kerrane and Alpart providing fifty percent of such costs, and Ted Mignatti III and Ted Mignatti Jr. providing the other fifty percent.  Taxes were to be split in the same fashion until the land was sold.  Accordingly, the August 1994 letter stated:  "50/50 split in financing of any costs

_____

(...continued)
with Ted Mignatti III, and not Ted Mignatti Jr. (McKenna dep., Ex. 1 at p. 74, lines 12-22; Ted Mignatti dep., Ex. 2 at p. 30 lines 9-19).

incurred during the due [diligence] period and through foreclosure until the land is titled, taxes will be split 50/50 until disposition" (Ex. 8; Ex. 10 at § 1.3.5; Ted Mignatti dep., Ex. 2 at p. 25 line 16 – p. 26 line 22);

c)   Third, costs incurred after titling were the responsibility of Ted Mignatti III and Ted Mignatti Jr.  Accordingly, the August 1994 letter stated:  "T.J., III & T.J., Jr. will finance all development costs from the time land is titled and until buildout and/or disposition" (Ex. 8; Ex. 10 at § 1.3.6; Ted Mignatti dep., Ex. 2 at p. 26, lines 15-22).

11.     Under the terms of the Bucks County Agreement, the land was either to be sold at fair market value by the LC Partnership to an unrelated third party or to a building company affiliated with the Mignattis.  Accordingly, the August 1994 letter stated: "if any land is sold to a building company of either T.J., III & T.J., Jr.'s interest, a fair market value for the ground will be established to determine both a transfer price and the basis for the 50/50 split on 'land profits'."  (Ex. 8; Ex. 10 at § 1.3.8; Ted Mignatti dep., Ex. 2 at p. 27 line 11 – p. 28 line 7). In the event the land was sold to Mignatti-related entity for development, the land company would receive a mortgage note, rather than cash, and "the split on 'building profits' between the building company and Kerrane & Alpart will be 75% and 25% respectively."  (Id.).

*The Acquisition of the Land Pursuant to the Bucks County Agreement*

12.     Pursuant to the Bucks County Agreement, a Pennsylvania limited partnership, LC Associates, L.P. ("LC Partnership") was formed to acquire, hold and ultimately resell the Bucks County Land, and a written partnership agreement was executed ("LC

Agreement"). (Ex. 11; Answer, Countercls. ¶¶ 8 & 12). The LC Agreement contains no special provisions that would allow the General Partner to convey the Bucks County Land at less than fair market value. (Ex. 11).

13.     The limited partners of LC Partnership, when it was formed, were Alpart, Dan Kerrane, Ted Mignatti III, and Ted Mignatti Jr., each with a 24.75% partnership share; its general partner, which held the remaining 1% partnership share, was General Land Partners, Inc. ("General Land Partners"). (Ex. 7 at p. 6; Ex. 11 at § 1.04 & "Exhibit A").

14.     Ted Mignatti III initially served as the president, secretary, and treasurer of General Land Partners and managed, operated and controlled both LC Partnership and General Land Partners. (Answer ¶ 28; Ex. 7 at p. 5; McKenna dep., Ex. 1 at p. 38 line 12 – p. 39 line 1).

15.     Under Section 9.01 of the LC Agreement, distributions by LC Partnership to the limited partners were to be in proportion to their respective partnership shares. (Ex. 11 at § 9.01). This provision accords with the requirement of the Bucks County Agreement that "land profits" be divided 50% to Kerrane and Alpart, and 50% to Ted Mignatti III and Ted Mignatti Jr. (Ex. 8; Ex. 10 at § 1.3.7).

16.     In further accordance with the terms of the Bucks County Agreement, LC Partnership did, in or about August 1994, acquire approximately 276 acres of land in Warwick Township, Bucks County by purchasing a mortgage note from the Resolution Trust Corporation ("RTC") that encumbered the land, and thereafter foreclosing on the mortgage. (Answer, Countercls. ¶ 13; Ted Mignatti dep., Ex. 2 at p. 34, lines 8-18).

17.     In accordance with the terms of the Bucks County Agreement, Alpart and Dan Kerrane did provide all up front acquisition costs, in the amount of $1,260,000, to cover the purchase of the mortgage note from the RTC.  (Ted Mignatti dep., Ex. 2 at p. 42 line 18 – p. 43 line 14; McKenna dep., Ex. 1 at p. 79, lines 15-19).

18.     Following the foreclosure proceedings, the Bucks County Land was titled on or about August 23, 1999, when the Bucks County Sheriff conveyed it to LC Partnership by deed.  (Ex. 12 at p. DEF02218).

19.     Beginning in or about October 1999, two additional parcels of land contiguous to the initial RTC purchase were acquired and became part of the Bucks County Land.  (Ex. 9 at § 5).

20.     The additional parcels totaling 64 acres were purchased by Kam2 Enterprises, LLC ("Kam2"), a Pennsylvania limited liability company that was formed for that purpose.  (Ted Mignatti dep., Ex. 2 at p. 10, lines 10-24).  Although this acquisition took place after titling of the original 276 acres, Kerrane and Alpart contributed two-thirds of the funds used to purchase this additional parcel.  (McKenna dep., Ex. 1 at p. 346 lines 5-8 & p. 347 lines 3-22).

21.     Alpart, Dan Kerrane, Ted Mignatti III, and Ted Mignatti Jr. each held a twenty-five percent (25%) interest as members of Kam2, and the parties agreed that Kam 2 would acquire the additional parcels pursuant to the terms of the Bucks County Agreement.  (Ex. 7 at p. 6; Ex. 9 at § 5).

22.     Ted Mignatti III passed away on November 19, 2001.  (Answer ¶ 10).

23.     Tracy Mignatti is the widow of Ted Mignatti III, and Executrix of his Estate.  She is the successor in interest to the rights and obligations of Ted Mignatti III under the Bucks County Agreement and the LC Agreement and, as such, a limited partner in LC Partnership and a member of Kam2.  (Answer ¶ 10; Ex. 7 at p. 6).

24.     Dan Kerrane passed away on October 28, 2002.  (Answer ¶ 4).

25.     Lynette Kerrane is the widow of Dan Kerrane and a Trustee and, with her children, the sole beneficiaries of the GST Non-Exempt QTip Marital Trust.  (Answer ¶ 4; Lynette Kerrane dep., Ex. 4 at p. 15 line 9 – p. 16 line 4).

26.     Lynette Kerrane and Eric Wojcikiewicz as sole Trustees of the GST Non-Exempt QTip Marital Trust, are successors in interest to rights and obligations of Dan Kerrane under the Bucks County Agreement and the LC Agreement and, as such, a limited partner in LC Partnership and a member of Kam2.  (Id.; Ex. 7 at p. 6).

27.     Defendant Steve McKenna is president of Mignatti Companies and has held that position since at least 1991.  (McKenna dep., Ex. 1 at p. 10, lines 1-12).

28.     Following the death of Ted Mignatti III, defendant Steve McKenna became president, secretary and treasurer of General Land Partners, and he took over as the "day-to-day manager" of the company.  (Ex. 7 at p. 5; McKenna dep., Ex. 1 at p. 29 line 23 – p. 30 line 5; Id. at p. 38, lines 12-16; Ted Mignatti dep., Ex. 2 at p. 9 lines 8-14).

29.     At all times since the death of Ted Mignatti III, defendants Ted Mignatti Jr., Steve McKenna, and Tracy Mignatti have managed, operated, and controlled LC Partnership and its general partner, General Land Partners.  Specifically, McKenna controlled all day-to-day

operations; McKenna reported to and consulted with Ted Mignatti Jr., who approved all significant decisions; and Tracy Mignatti was included when the three would arrive at a consensus with respect to major decisions.  (Ted Mignatti dep., Ex. 2 at p. 8 line 16 – p. 10 line 9).

30.     Following the death of Ted Mignatti III, Alpart, Dan Kerrane, Ted Mignatti Jr., Steve McKenna and Tracy Mignatti reaffirmed that the August 9, 1994 letter and the Warwick Greens Document accurately set forth the terms of the Bucks County Agreement. (McKenna dep., Ex. 1 at p. 122, lines 6-19; Ex. 9 at § 4(e)).

*The Mignattis Sell Themselves the Bucks County Land at Far Below Fair Market Value*

31.     The individual Defendants formed Creek Road Development Group L.P. ("Creek Road Partnership") in or about January 2003 for the purpose of acquiring and developing the Bucks County Land.  (Ex. 7 at p. 4; McKenna dep., Ex. 1 at p. 60, lines 5-11).

32.     The limited partners of Creek Road Partnership are defendants Tracy Mignatti with a 34.54 % share, Ted Mignatti Jr. with a 33.54% share, and Steve McKenna with a 30.92% share, and its general partner is Creek Road Development Group, Inc. ("Creek Road Corporation").  (Ex. 7 at p. 4).

33.     Defendant Steve McKenna is, and has since its incorporation been, president and sole officer of Creek Road Corporation.  (Id.).

34.     Defendant Ted Mignatti Jr. is, and has since its incorporation been, sole director of Creek Road Corporation.  (Id.).

35.     At all times since its formation, defendants Ted Mignatti Jr., Steve McKenna, and Tracy Mignatti have managed, operated, and controlled Creek Road Partnership and its general partner, Creek Road Corporation.  Specifically, McKenna controlled all day-to-day operations; McKenna reported to Ted Mignatti Jr., who was consulted on all significant decisions; and Tracy Mignatti was included when the three would arrive at a consensus with respect to major decisions.  (Ted Mignatti dep., Ex. 2 at p. 13, lines 1-16).

36.     On or about May 22, 2006, LC Partnership's general partner, General Land Partners, caused LC Partnership to convey the Bucks County Land's 210 lots to Creek Road Partnership for $50,000 per lot.  (Ex. 12; McKenna dep., Ex. 1 at p. 51 lines 14-17; Id. at p. 106 lines 12-15).

37.     The $50,000 per lot transfer price for the Bucks County Land was set by defendants Ted Mignatti Jr. and Steve McKenna.  (Ted Mignatti dep., Ex. 2 at p. 69 line 21 – p. 70 line 1; McKenna dep., Ex. 1 at p. 106 lines 12-15; id. at p. 148 lines 15-20; id. at p. 161 lines 15-22; Ex. 6 at p. 4 no. 6).

38.     Prior to the conveyance, defendant Tracy Mignatti was consulted regarding, and agreed to, the $50,000 per lot transfer price for the Bucks County Land prior to the transfer.  (Tracy Mignatti dep., Ex. 3 at p. 84 lines 7-24; id. at p. 88, lines 16-21).

39.     Defendants did not inform Plaintiffs of the May 2006 transfer of the Bucks County Land from LC Partnership to Creek Road Partnership, or of the $50,000 per lot transfer price, until more than six months later, in December 2006.  (McKenna dep., Ex. 1 at p. 105, lines 10-21; id. at p 148, lines 15-20).

40.     The $50,000 per lot transfer price was far below the fair market value of the Bucks County Land at the time of the transfer.  (Ex. 13; Ted Mignatti dep., Ex. 2 at p. 77, lines 14-17).

41.     Defendants Ted Mignatti Jr., Steve McKenna, and Tracy Mignatti never intended that the $50,000 per lot would constitute fair market value for the land; rather, defendants Ted Mignatti Jr., Steve McKenna and Tracy Mignatti set the transfer price based on what they unilaterally considered to be a fair return on Alpart and Dan Kerrane's investment.  (McKenna dep., Ex. 1 at p. 166, lines 14-23; Ted Mignatti dep., Ex. 2 at p. 70, lines 2-15).

42.     At the time they set the transfer price and caused the transfer of the Bucks County Land, defendants Ted Mignatti Jr., Steve McKenna, and Tracy Mignatti were in possession of an appraisal report that valued the land at $169,524 per lot.  That report had been prepared by independent appraisers LaGreca & Quinn Real Estate Services in April 2006 – just one month earlier – in connection with defendant Creek Road Partnership's application to Franklin Bank for construction financing.  (Ex. 13; McKenna dep., Ex. 1 at p. 160 lines 12-19; Ted Mignatti dep., Ex. 2 at p. 68 lines 16-19).

43.     In reliance on the accuracy of the appraisal, Franklin Bank did provide a construction line of credit to Creek Road Partnership.  (Ted Mignatti dep., Ex. 2 at p. 77, lines 6-13).

44.     On or about May 22, 2006 defendant Ted Mignatti executed a Limited Guaranty Agreement in the principal amount of $10,000,000 in connection with the Construction Loan Agreement, of the same date, between Creek Road Partnership and Franklin Bank, SSB.  (Ex. 14; Ted Mignatti dep., Ex. 2 at p. 132, lines 17-23).

45.     On or about May 22, 2006 defendant Steve McKenna executed a Limited Guaranty Agreement in the principal amount of $10,000,000 in connection with the Construction Loan Agreement, of the same date, between Creek Road Partnership and Franklin Bank, SSB. (Ex. 15).

46.     As acknowledged at his deposition, Ted Mignatti Jr. agrees that the LaGreca & Quinn appraisal was an accurate valuation of the Bucks County Land.  (Ted Mignatti dep., Ex. 2 at p. 81 lines 2-12).

47.     In accordance with the Bucks County Agreement, Creek Road Partnership made no cash payment to LC Partnership at the time of the transfer of the Bucks County Land. Instead, an interest-accruing mortgage note in the amount of the full $10,500,000 purchase price ($50,000 per lot, for 210 lots) was issued by Creek Road Partnership to LC Partnership in 2006. (Ex. 8; Ex. 10 at § 1.3.8; Ex. 16 at p. 6 "Note 4").

48.     Under the terms of the mortgage note, a payment of $50,000 became owing and due from Creek Road Partnership to LC Partnership as each of the 210 building lots, comprising the Bucks County Land, was built out, sold, and closed.  (Id; McKenna dep., Ex. 1 at p. 193, line 9 to p. 194, line 12).

49.     In accordance with the Bucks County Agreement, those sums paid by Creek Road Partnership to LC Partnership on the mortgage note would then be distributed to the limited partners of LC Partnership, including plaintiffs, as "land profits."  (Ex. 8; Ex. 10 at § 1.3.7; Ex. 11 at § 3.02; McKenna dep., Ex. 1 at p. 194, lines 4-12).

50.     Prior to May 15, 2008, Creek Road Partnership made a payment to LC Partnership of $550,000, then due under the note on account of the 11 building lots that had

closed to that date.  (McKenna dep., Ex. 1 at p. 199, lines 1-4; id. at p. 280, lines 7-17; Ex. 17 at

p. 3).

       51.     LC Partnership did not distribute the $550,000 payment from Creek Road

Partnership to its limited partners as "land profits" in accordance with the Bucks County

Agreement; instead the $550,000 was transferred back to Creek Road Partnership.  (McKenna

dep., Ex. 1 at p. 199, lines 5-11; id. at p. 280, lines 18-24).

       52.     The decision to transfer the $550,000 payment back to Creek Road

Partnership, rather than to distribute those funds to the limited partners of LC Partnership, was

made by defendants Ted Mignatti Jr., Steve McKenna, and Tracy Mignatti.  (Ted Mignatti dep.,

Ex. 2 at p. 118, lines 9-15; McKenna dep., Ex. 1 at p. 199, lines 12-22).

       53.     Plaintiffs were informed neither of the $550,000 payment from Creek

Road Partnership to LC Partnership, nor of the transfer of those funds back to Creek Road

Partnership by defendants.  (Ted Mignatti dep., Ex. 2 at p. 118, lines 16-23; McKenna dep., Ex. 1

at p. 199, lines 12-22).

       54.     Defendants do not intend to distribute twenty-five percent (25%) of the

building profits to Plaintiffs, but instead intend to make any such distributions to the LC

Partnership.  (Ex. 6 at p. 8 no. 13; Ex. 9 at § 4(e)(4)(b)(ii)).

       55.     Since Plaintiffs hold only a fifty percent (50%) combined interest in LC

Partnership (the other fifty percent (50%) interest being held by defendants Ted Mignatti Jr. and

Tracy Mignatti), Plaintiffs would receive only twelve and one-half percent (12.5%) of the

building profits, should Defendants carry out their intention to distribute the twenty-five percent

(25%) of the building profits to LC Partnership.  (McKenna dep., Ex. 1 at p. 125 line 21 – p. 127 line 5).

56.     As conceded by Defendants, Alpart never agreed to a transfer of the Bucks County Land by LC Partnership at less than its fair market value.  (McKenna dep., Ex. 1 at p. 148 lines 15-24; id. at p. 167 lines 15-18; Ted Mignatti dep., Ex. 2 at p. 65 lines 12-21).

57.     As conceded by Defendants, neither Dan Kerrane nor his successors in interest ever agreed to a transfer of the Bucks County Land by LC Partnership at less than its fair market value.  (Id.).

58.     Alpart never agreed to payment of the twenty-five percent (25%) of the building profits to LC Partnership, rather than to Alpart and Dan Kerrane.  (McKenna dep., Ex. 1 at p. 139 line 19 – p. 140 line 6; id. at p. 144 line 24 – p. 145 line 13).

59.     Neither Dan Kerrane nor his successors in interest ever agreed to payment of the twenty-five percent (25%) of the building profits to LC Partnership, rather than to Alpart and Dan Kerrane.  (Id.).

60.     In 2008, defendants Ted Mignatti Jr. and Steve McKenna caused the transfer of "a couple million dollars" in profits from a related project in which Plaintiffs are invested in Barnegat, New Jersey ("Barnegat profits"), as an unsecured loan to Creek Road Partnership.  (McKenna dep., Ex. 1 at p. 205 line 23 – p. 206 line 7; Ted Mignatti dep., Ex. 2 at p. 111 line 23 – p. 113 line 11).

15

61.     The land and building companies involved in the New Jersey project are Mignatti related entities which are operated and controlled by Ted. Mignatti Jr., McKenna and Tracy Mignatti.  (Ex. 7 at pp. 1, 4 & 6; McKenna dep., Ex. 1 at p. 29 line 23 – p. 31 line 5).

62.     The Barnegat profits would otherwise have been distributable in part, directly or indirectly, to Plaintiffs.  (Ex. 9 at §§ 2-3).

63.     Transfer of the Barnegat profits to Creek Road Partnership was never disclosed to Plaintiffs until required by discovery in this action.  (McKenna dep., Ex. 1 at p. 207 lines 10-20).

## B.     The Causes Of Action

Based upon the facts pleaded, Plaintiffs set forth causes of action against General Land Partners, Tracy Mignatti, and Ted Mignatti, Jr. for breach of fiduciary duty regarding their conduct as actual or de facto general partners of the LC Partnership (Count I); against Tracy Mignatti only for breach of the Bucks County Agreement (Count II); against Tracy Mignatti, Ted Mignatti, Jr. and General Land Partners for breach of the LC Agreement (Count III);[7] against all Defendants except Tracy Mignatti for tortious interference with the Bucks County Agreement (Count IV); against McKenna, Creek Road Partnership and Creek Road Corporation for tortious interference with the LC Agreement (Count V); against all defendants for Civil Conspiracy (Count VI), Unjust Enrichment (Count VII), and Declaratory Judgment (Count VIII); and against General Land Partners and Creek Road Corporation for an accounting (Count IX).

At this stage of the proceedings, Plaintiffs are limiting their request for summary judgment to Counts I through IV, along with Defendants' "Count II" counterclaim against

---

[7]     Both breach of contract counts also included a claim for anticipatory breach.

Plaintiffs for an alleged breach of the implied covenant of good faith and fair dealing.  Plaintiffs ask that the Court find Defendants liable on these counts, issue an appropriate declaration of rights, and set a hearing to establish damages.

## III.   LEGAL STANDARD APPLICABLE TO MOTIONS FOR SUMMARY JUDGMENT

Summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  In other words, summary judgment is appropriate when the evidence "is so one-sided that one party must prevail as a matter of law."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 243 (1986).

When a motion for summary judgment is made and supported, the burden shifts to the non-moving party to point to specific facts indicating that there is a genuine factual issue for trial.  Jersey Cent. Power & Light Co. v. Lacey Twp., 772 F.2d 1103, 1109 (3d Cir. 1985); see also Anderson, 477 U.S. at 248 ("[A] party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial.'") (citation omitted).  "[A] genuine issue means that the evidence must create a fair doubt, and wholly speculative assertions will not suffice."  Jersey Cent., 772 F.2d at 1109 (citation omitted).  As such, Rule 56 does not allow a party opposing summary judgment to rely solely upon bare assertions, conclusory allegations, or mere suspicions.  Fireman's Ins. Co. v. DuFresne, 676 F.2d 965, 969 (3d Cir. 1982); see also Nieves v. Hess Oil Virgin Islands Corp., 819 F.2d 1237, 1252 (3d Cir. 1987) (stating that "unsupported allegations and assertions do not prevent summary judgment").

Because Defendants McKenna and Ted Mignatti, Jr., in their depositions, have admitted facts that establish the elements of three causes of action set forth in the Amended Complaint, and because Defendants have produced numerous documents which further support Plaintiffs' claims, Plaintiffs meet the standard for summary judgment with respect to those claims.  Conversely, based on Defendants' inability to articulate any wrongdoing by Plaintiffs or harm suffered by Defendants that would establish a right to the relief sought by Defendants in their second counterclaim, summary judgment should be entered against Defendants on that claim as well.

## IV.   ARGUMENT

This case essentially turns on the following key facts, which are dispositive and undisputed:

(i) Defendants admittedly engaged in a self-interested transaction when they transferred a prime parcel of approximately 340 acres of Bucks County land from one limited partnership controlled by Defendants to another limited partnership controlled by Defendants, and they did so without notice to Plaintiffs;

(ii) Defendants knowingly caused the parcel to be conveyed at a small fraction of fair market value, notwithstanding an independent contemporaneous appraisal that they concede was accurate; and

(iii) the terms of the agreements intended to govern the relationship among the parties to this lawsuit and their predecessors in interest were initially agreed upon and summarized in certain written documents, and were later changed without the express consent of Plaintiffs – after two parties to the original agreements died – in order to reduce the share of profits to which Plaintiffs were entitled.

18

Those three central facts ultimately require that summary judgment be entered in Plaintiffs' favor with respect to the causes of action discussed below.

### A.     Tracy Mignatti Is Liable For Breach Of The Bucks County Agreement.

In order to establish a breach of contract claim in Pennsylvania, a plaintiff must prove:  (i) the existence of a contract, including its essential terms; (ii) a breach of duty imposed by the contract; and (iii) resultant damages.  Corestates Bank, N.A. v. Cutillo, 723 A.2d 1053, 1058 (Pa. Super. Ct. 1999).  "It is a presumption of law that the parties to a contract bind not only themselves but their personal representatives," and, as a result, executors of estates "are held liable on all contracts of the testator which are . . . broken after his death," with only limited exceptions for contracts relating to personal skill or taste.  United States ex rel Wilhelm v. Chain, 300 U.S. 31, 35 (1937).

A contract, of course, need not be written.  It is well-established that an oral agreement is legally binding and fully enforceable, even where it is not confirmed in writing, as the Bucks County Agreement was here.  See DeMarchis v. D'Amico, 637 A.2d 1029, 1033 (Pa. Super. Ct. 1994) (recognizing the widely accepted principle that a partnership need not have a formal or written partnership agreement); 4 Corbin on Contracts § 17.12 (1997) (explaining that an oral partnership agreement is valid even if the partnership will own or deal in real property).  Plaintiffs are entitled to summary judgment with respect to Count II because, as set forth below, no genuine issues of material fact exist with respect to the elements of their claim that the Bucks County Agreement was breached and Tracy Mignatti is liable.

### 1.     The Bucks County Agreement Was A Valid And Binding Contract.

Defendants do not dispute the existence of the Bucks County Agreement – indeed, they have explicitly conceded that Alpart, Dan Kerrane and Ted Mignatti, III entered into

19

an oral agreement in 1994 "to acquire and develop land in Bucks County, Pennsylvania."[8]  See

Ex. 6 at pp. 8-9 no. 14.  They have further admitted that the agreement terms were set forth in an

August 9, 1994 letter and the Warwick Greens Document, both of which were authored by Ted

Mignatti, III.  See id.; Ex. 9 at § 4.  It is undisputed that the following were terms of the original

Bucks County Agreement:

> (i)     Alpart and Dan Kerrane were to invest capital to cover "up
> front" acquisition costs of the Bucks County Land.
>
> (ii)    In exchange for their capital contributions, Alpart and Dan
> Kerrane were to receive a return of their capital contributions, fifty
> percent of the "land profits" from the resale of the land, and
> twenty-five percent of the "building profits" if the land were resold
> to and developed by a Mignatti related entity.
>
> (iii)   If resold to a Mignatti related entity, "a ***fair market value***
> for the ground [would] be established" to determine the transfer
> price and the basis for the split of land profits.

Ex. 8 (emphasis added); see Ex. 10 at § 1.3; Ex. 9 at § 4(e); McKenna dep., Ex. 1 at p. 119, lines

5-15; Ted Mignatti dep., Ex. 2 at p. 25 line 2 – p. 28 line 7.

For the reasons that follow, Defendants' own documents and testimony

demonstrate that the Bucks County Agreement has been breached in two essential ways, and

therefore Tracy Mignatti, in her capacity as Executrix of Ted Mignatti III's estate, is liable to

Plaintiffs for breach of contract.

---

[8]     Defendants contend that Ted Mignatti, Jr., was also a party to the Bucks County
Agreement, while Plaintiffs believe he was a party to a separate side agreement with Ted
Mignatti, III, only.  This dispute, however, is immaterial to Plaintiffs' allegations in
Count II.  The parties agree that there was a binding contract, and they agree on the
essential terms that it contained at the outset.  Whether those terms were later changed
and whether Defendants' admissions establish that those terms were breached are legal
determinations that can be made by the Court at this stage regardless of whether Ted
Mignatti, Jr. was a party to the original agreement.

**2.      The Bucks County Agreement Was Breached When The Land Was Transferred For Less Than Fair Market Value.**

Defendants have breached the Bucks County Agreement in two material respects. First, the Bucks County Land was transferred from the LC Partnership to the Creek Road Partnership for a value that was admittedly less than the appraised fair market value.[9]  See Ex. 13; McKenna dep., Ex. 1 at p. 148, lines 15-20; id. at p. 161, lines 15-22; Ted Mignatti dep., Ex. 2 at p. 69 line 21 – p. 70 line 1.  Defendants' only explanation for this was that "fair market value" never meant "fair market value."  See Ex. 6 at p. 4 no. 6 (claiming that "the transfer of the land from the land company to the development company was to be different from the typical arms' length [sic] transaction between a landowner and developer").  Yet, a party cannot defeat summary judgment by simply claiming, *post hoc* and in conclusory fashion, that commonly used terms with a generally accepted meaning should be interpreted to mean something entirely different.

As an initial matter, and as judicially recognized, "fair market value" is a term with a commonly-understood definition:  "fair market value is defined as 'a price which a purchaser, willing but not obliged to buy, would pay an owner, willing but not obliged to sell, taking into consideration all uses to which the property is adapted and might in reason be applied.'"  Jackson v. Bd. Of Assessment Appeals, 950 A.2d 1081, 1086 (Pa. Commw. Ct. 2008)

---

[9]      Defendants are quite candid about their decision to disregard a contemporaneous appraisal of the Bucks County Land (which concluded that its fair market value was nearly $170,000 per lot).  When asked whether he considered the appraiser's conclusion regarding fair market value as a factor in setting the transfer value of the land, Ted Mignatti Jr. testified that the appraiser's value and the transfer value "have nothing to do with each other."  Ted Mignatti dep., Ex. 2 at p. 69 line 21 – p. 70 line 15.  Similarly, McKenna acknowledged having seen the appraisal report prior to the transfer of the Bucks County Land, but admitted that he "didn't use [it] as part of [his] coming up with a value for the land transfer."  McKenna dep., Ex. 1 at p. 160 line 12 – p. 162 line 5.

(quoting <u>F&M Schaeffer Brewing Co. v. Lehigh County Bd. of Appeals</u>, 610 A.2d 1, 3 (Pa. 1992)); <u>see also</u> Black's Law Dictionary1549 (7th ed. 1999) (defining the term as "the price that a seller is willing to accept and a buyer is willing to pay on the open market and in an arm's-length transaction"); Webster's Ninth New Collegiate Dictionary 445 (1988) (defining the term as "a price at which both buyers and sellers are willing to do business").

Moreover, to ensure that there was no dispute over what was in fact the fair market value of the land, the Bucks County Agreement required that the fair market value be "established" and "agreed upon" by the parties to the contract. <u>See</u> McKenna dep., Ex. 1 at p. 158 lines 9-15; <u>id.</u> at p. 164 line 7; <u>id.</u> at p. 168 line 24 – p. 169 line 4; <u>id.</u> at p. 154 line 16 – p. 155 line 2.[10] It is undisputed that Defendants chose to ignore this requirement as well, and that neither Alpart nor Dan Kerrane (nor Dan Kerrane's successors) were informed of the $50,000 per lot transfer price selected by Defendants until many months after the transfer occurred. <u>See</u> McKenna dep., Ex. 1 at p. 148, lines 15-20.

Defendants' unilateral decision to transfer the Bucks County Land from the LC Partnership to the Creek Road Partnership for a fraction of the appraised fair market value of the land – a "self-interested transaction" that will be further examined in section B, <u>infra</u> – constitutes a material breach of the Bucks County Agreement that directly harmed Plaintiffs by reducing the land profits to which they have been, and will continue to be, entitled.

---

[10]     Alpart, the only surviving party to the Bucks County Agreement, confirmed that he understood the contract to require that the parties agree on the fair market value, with resort to an independent appraiser should the parties disagree. <u>See</u> Alpart dep., Ex. 5 at p. 35 line 21 – p. 37 line 7.

**3.     Defendants Intend To Further Breach The Bucks County Agreement By Reducing Plaintiffs' Share of Any Building Profits**

The Bucks County Agreement was further breached when Defendants asserted their intent to distribute 25% of the "building profits" to the LC Partnership, rather than directly to Plaintiffs.  See Ex. 6 at p. 8 no. 13.  Although Defendants contend that this particular term of the Bucks County agreement was subsequently changed, see McKenna dep., Ex. 1 at p. 142 line 12 – p. 143 line 8, they concede that they can point to no document containing an explicit agreement by Plaintiffs to the change, nor can they identify any conversation in which Plaintiffs orally agreed to the change.  See id. at p. 138 line 20 – p. 140 line 6.  Indeed, the best Defendants offer in this regard is an assertion that Plaintiffs were informed of Defendants' intention to unilaterally change this aspect of the Bucks County Agreement, and that Plaintiffs never objected.  Id.

Defendants' assertion relies on their own self-serving deposition testimony,[11] and written investment summaries prepared by McKenna on behalf of the Defendants.  See, e.g., Ex. 9 at § 4; Ex. 18 at § 4.  Such documents cannot alter the terms of an established contract, as they were prepared by McKenna – who was not a party to the contract sought to be modified – and they do not demonstrate that all parties to the contract agreed to the modification.  See Trombetta v. Raymond James Fin. Servs., Inc., 907 A.2d 550, 558 (Pa. Super. Ct. 2006) (placing the burden of proving a contract modification on the party asserting the modification, and recognizing that a

---

[11]     Defendants may not simply rely on their own conclusory allegations that the material terms of the Bucks County agreement were changed sometime after 1994 in order to oppose summary judgment here.  Fireman's Ins. Co. v. DuFresne, 676 F.2d 965, 969 (3d Cir. 1982) (holding that a party may not rely solely on bare assertions, conclusory allegations or mere suspicions in opposing summary judgment); see also Nieves v. Hess Oil V.I. Corp., 819 F.2d 1237, 1252 (3d Cir. 1987) (stating that "unsupported allegations and assertions do not prevent summary judgment").

contract may not be modified absent "assent of both contracting parties").  Indeed, McKenna

himself concedes that he was not aware of the original terms of the Bucks County Agreement

until he conducted "discovery" following Ted Mignatti III's death, and he admits that the only

documents reflecting those terms are the 1994 Letter and the Warwick Greens Document.  See

McKenna dep., Ex. 1 at p. 84 lines 16-22; Ex. 9 at § 4(e); Ex. 18 at § 4(e).

      Even if the summaries could somehow change a material term to an existing

contract, the summaries – which are clear and consistent with respect to all other material terms

of the Bucks County Agreement – are, at best, ambiguous with respect to the intended term

involving building profits.  Compare Ex. 9 at § 4(e)(i)(3)(a) (stating that the only documents

capturing the terms of the Bucks County Agreement were the August 9, 1994 letter and the

Warwick Greens Document, both of which state that 25% of the building profits are payable to

Alpart and Dan Kerrane), with id. § 4(e)(i)(4)(b)(ii) (stating that 25% of the building profits will

be distributed to the LC Partnership).  Because ambiguities must be construed against the drafter,

Raiken v. Mellon, 582 A.2d 11, 13 (Pa. Super. Ct. 1990), the investment summaries cannot be

read to modify the Bucks County Agreement.

      As the parties asserting that the contract was modified, the burden would be on

Defendants to prove that a valid modification – to which all parties to the contract assented –

occurred.  Trombetta, 907 A.2d at 558.  Defendants simply cannot meet that burden here,

because no such modification existed.  The contract term granting Plaintiffs 25% of any building

profits was never validly modified because Plaintiffs never consented to its modification.  As

such, the terms of the original agreement continue to bind the parties, and Plaintiffs are entitled

to 25% of the "building profits" without having those profits diluted by receiving them via a

distribution to the LC Partnership.  Defendants have unambiguously stated their intention to

breach that contract term, thus eliminating any issue of material fact which may have existed with respect to the claim set forth in Count II.[12]

**B.    General Land Partners, Tracy Mignatti, and Ted Mignatti, Jr. Breached Fiduciary Duties Owed to Plaintiffs.**

In order to support a claim of breach of fiduciary duty, a plaintiff must prove the following elements:  (i) that the defendant either negligently or intentionally failed to act in good faith and for the benefit of the plaintiff; (ii) that the plaintiff was injured; and (iii) that the defendant's failure to act in good faith and for the benefit of the plaintiff was "a real factor" in causing the plaintiff's injuries.  McDermott v. Party City Corp., 11 F. Supp. 2d 612, 626 n.18 (E.D. Pa. 1998) (citing the relevant provision of Pennsylvania's Suggested Standard Jury Instructions).

In the context of a limited partnership, it is axiomatic that general partners owe a fiduciary duty to limited partners, and that general partners may be found liable for breaching that duty.  15 Pa. Cons. Stat. Ann. §§ 8334, 8533; Jarl Investments, L.P. v. Fleck, 937 A.2d 1113, 1123 (Pa. Super. Ct. 2007); see Haymond v. Lundy, No. 99-5015, 2000 WL 804432, at *14 (E.D. Pa. June 22, 2000) (Shapiro, J.) ("The general partner of a limited partnership owes the partnership and his partners the fiduciary duty of loyalty."); see also Clement v. Clement, 260 A.2d 728, 729 (Pa. 1970) ("[P]artners owe a fiduciary duty one to another . . . One should be allowed to trust his partner, to expect that he is pursuing a common goal and not working at cross-purposes.").

---

[12]    Under these circumstances, Plaintiffs have chosen to accept the breach and sue at once, as they are permitted to do.  Simon Wrecking Co., Inc. v. AIU Ins. Co., 350 F. Supp. 2d 624, 634-35 (E.D. Pa. 2004) (Brody, J.)

Furthermore, an officer, affiliate, or parent of a corporate general partner who either controls or participates in the alleged wrongdoings of the general partner owes the same fiduciary duties to limited partners as the general partner itself. <u>Wallace v. Wood</u>, 752 A.2d 1175, 1181 (Del. Ch. 1999); <u>see also</u> <u>Bigelow/Diversified Secondary P'ship Fund v. Damson/Birtcher Partners</u>, No. 16630, 2001 WL 1641239, at *8 (Del. Ch. Dec. 4, 2001) (holding that affiliates of a corporate general partner owe fiduciary duties to limited partners based on their control over the "day-to-day operations and affairs" of the partnership). In Pennsylvania, this principle is commonly called the "participation theory," which will be more fully examined below.

Because no material facts exist with respect to Plaintiffs' breach of fiduciary duty claim against General Land Partners, Tracy Mignatti, and Ted Mignatti, Jr. (the "Count I Defendants"), entry of summary judgment in Plaintiffs' favor on Count I is warranted.

### 1. The Count I Defendants Owed A Fiduciary Duty To Plaintiffs.

As a preliminary matter, it is beyond dispute that General Land Partners, as general partner in the LC Partnership, owed – and continues to owe – a fiduciary duty of loyalty to the limited partners, including Plaintiffs. Defendants have never seriously contested that fact. The issue that was subject to greater debate during the pleading stage of this litigation was whether Ted Mignatti, Jr. and Ted Mignatti, III (through Tracy Mignatti as his successor and Executrix of his estate) owed that same fiduciary duty to Plaintiffs despite their designation as limited partners. In light of the facts that have been revealed during discovery, however, no dispute remains with respect to the participation of the Mignattis in the actions of General Land Partners and the fiduciary obligations imposed upon them as a result of that participation.

As this Court has already recognized, Pennsylvania's participation theory "imposes personal liability on corporate officers or shareholders where they have personally

taken part in the actions of the corporation." Wicks v. Milzco Builders, Inc., 470 A.2d 86, 90 (Pa. 1983). Where the wrong alleged is "a result of an active, knowing participation" by limited partners, such partners may be held liable under Pennsylvania law. Brindley v. Woodland Village Restaurant, 652 A.2d 865, 868 (Pa. Super. 1995); see also Aug. 19, 2008 Mem. & Order, doc. no. 51, at p.12 & n.12 (discussing Pennsylvania law and stating that "the participation theory is sufficient for holding the limited partners liable").

　　　　　Furthermore, when the transaction at issue is a self-interested one, the general partners – and others liable pursuant to the participation theory – owe the limited partners the highest duty to show the "entire fairness" of the transaction in which they have a self-interest. Wurtzel v. Park Town Place Apartments Ltd. P'ship, No. 3511, 2001 WL 1807405, at *5 (Pa. Ct. C.P. Sept. 11, 2001) (citing Smith v. VanGorkom, 488 A.2d 858, 890 (Del. 1985) and holding that "a general partner has a . . . duty of full and fair disclosure"); cf. Geddes v. Anaconda Copper Mining Co., 254 U.S. 590, 599 (1921) (discussing transactions between corporations with common directors, and holding that "where the fairness of such transactions is challenged the burden is upon those who would maintain them to show their entire fairness").

　　　　　Here, Defendants have admitted that they control – and have always controlled – the operations of General Land Partners. See Ted Mignatti dep., Ex. 2 at p. 9 line 4 – p. 10 line 9. They have acknowledged jointly making the key decisions at issue in this litigation during the course of their control of the general partners in both the land and building companies; for instance, they decided when, to whom, and for what consideration to transfer the Bucks County land, and they decided that certain land profits should be loaned (or "voluntarily returned") to the building company rather than paid out to the shareholders in the land partnership. See McKenna dep., Ex. 1 at p. 106, lines 12-15; Tracy Mignatti dep., Ex. 3 at p. 88, lines 16-21; Ted Mignatti

dep., Ex. 2 at p. 118, lines 9-15.  Furthermore, they have affirmatively described themselves as "general partners" of the relevant entities.  <u>See</u> SM dep., p. 195 line 21 – p. 196 line 8.  As such, their status as general partners – and the fiduciary duties that come along with that status – are no longer in dispute.

Moreover, Defendants have admitted that the transfer of the Bucks County land from the LC Partnership to the Creek Road Partnership was a self-interested transaction, as they admittedly owned Creek Road Partnership and controlled the general partners of both entities at the time of the transfer.  <u>See</u> McKenna dep., Ex. 1 at p. 51, lines 9-17; Ted Mignatti dep., Ex. 2 at p. 9 line 4 – p. 10 line 9; <u>id.</u> at p. 13 lines 1-16; <u>see also</u> McKenna dep., Ex. 1 at p. 364, lines 19-21 ("I can't say that we distinguish between General Land Partners and Creek Road Development Group.").  As such, the nature of this transaction is no longer in dispute.

Accordingly, the Count I Defendants each owed a fiduciary duty of loyalty to Plaintiffs as limited partners.  And, because the transactions at issue were admittedly self-interested, with the same parties controlling both the LC Partnership (and its general partner) and the Creek Road Partnership (and its general partner), the duty that was owed to Plaintiffs was a heightened one of full disclosure and entire fairness.

### 2.     The Count I Defendants Breached Their Fiduciary Duty To Plaintiffs.

In addition to admitting that they controlled the general partners of the relevant entities and engaged in a self-interested transaction when the Bucks County land was transferred, the Count I Defendants have also conceded that they engaged in specific conduct which, as a matter of law, constitutes a breach of the duties of full disclosure and entire fairness they owed to Plaintiffs.

First, Defendants admittedly transferred the Bucks County Land from the LC Partnership – which they controlled – to the Creek Road Partnership – which they likewise

controlled – without making any efforts to notify Plaintiffs in advance of the transaction or the

assigned land value.  See McKenna dep., Ex. 1 at p. 52, lines 14-22; id. at p. 148, lines 15-20;

Ted Mignatti dep., Ex. 2 at p. 65, lines 12-21.  This plainly violates Defendants' duty to fully

disclose material facts to the limited partners of the LC partnership.

Second, Defendants admittedly assigned a value ($50,000 per lot) to the Bucks

County Land without even considering – much less comporting with –  the known, appraised fair

market value of the land ($169,523 per lot), which was 340%  higher than the assigned value,

and without seeking Plaintiffs' consent.  See Ex. 13; McKenna dep., Ex. 1 at p. 148, lines 15-20;

id. at p. 161, lines 15-22; Ted Mignatti dep., Ex. 2 at p. 69 line 21 – p. 70 line 1.[13]  Again, this

action demonstrates Defendants' failure to abide by their duty of entire fairness throughout this

self-interested transaction.  This is particularly true in light of the fact that the LC Agreement

explicitly authorizes the general partner to exercise exclusive control over the business and

affairs of the partnership, including the purchase and sale of real property.  See Ex. 11 at §§ 4.01

& 4.02(a)(i).  The fiduciary duty that binds General Land Partners and the other Count I

Defendants, due to their participation in the affairs of the general partner, requires them to

---

[13]     Given this extraordinary fact, it is perhaps not surprising that Defendants objected
vociferously to document requests seeking the production of appraisals, even suggesting
to the Court that no such documents existed.  See Transcript of Aug. 25, 2008 Discovery
Conf., doc. no. 61, at p.14, lines 17-20 (included in the Appendix as Ex. 19).  Only after
nearly six months of litigation related to Plaintiffs' motion to compel and an order
following a hearing before this Court did Defendants produce the appraisal –
approximately eight months after Plaintiffs first requested it in discovery.  See Pls.' Mot.
to Compel, doc. no. 28 (attaching Plaintiffs' discovery requests and Defendants' blanket
objections thereto); Defs.' Resp. to Mot. to Compel, doc. no. 31; Pls.' Reply to Mot. to
Compel, doc. no. 33; Defs' Objections to Pls.' Doc. Reqs., doc. no. 43 (including
boilerplate objections based on relevance, vagueness, and overbreadth with respect to
Requests No. 25, 27 & 29 re: appraisals); Joint Statement of Issues for Discovery Conf.,
doc. no. 54 (including Defendants' continued objections to Requests No. 25, 27 & 29 re:
appraisals); Transcript of Aug. 25, 2008 Discovery Conf., doc. no. 61.  Defendants'
efforts to avoid producing this centrally relevant document are telling.

exercise their authority in a manner that protects the interests of all limited partners.  By unilaterally transferring land belonging to the partnership at a value that did not maximize the partnership's profit, and by doing so without the consent of the limited partners, the Count I Defendants breached their fiduciary obligations to Plaintiffs.

Third, Defendants' determination that a per-lot value of $50,000 – rather than the appraised per-lot value of more than triple that number – should be assigned for purposes of the transfer of the Bucks County Land necessarily reduced the land profits due to Plaintiffs, which are a percentage of that assigned value.[14]  Moreover, when land profits were realized following the sale of the first eleven lots from the Bucks County land, Defendants admittedly chose not to distribute those profits in accordance with the terms of the Note governing the transfer of the land.  See Creek Road Partnership Financial Statements, p. 6, note 4 (describing the terms of the mortgage note); SM dep., p. 194, lines 4-19.  Instead, Defendants loaned the $550,000 in distributed land payments back to Creek Road Partnership – which Defendants own and control, and in which Plaintiffs' have no financial stake – without notice to or consent from Plaintiffs.  See McKenna dep., Ex. 1 at p. 196 lines 3-20; Ted Mignatti dep., Ex. 2 at p. 118, lines 9-23.  In other words, Defendants acted in their own interests, to protect their own loan guarantees, disregarding the interests of the limited partners to the LC Partnership.[15]

---

[14]	In this regard, Defendants' land profits would likewise be reduced as a result of their unilateral valuation.  However, Defendants concede that a lower land value up front will ensure that the development project will yield higher building profits.  See McKenna dep., Ex. 1 at p. 166 line 16 – p. 167 line 5.  Thus, Defendants' actions will minimize the land profits, to which Plaintiffs are entitled to a share equal to Defendants' share, while maximizing the building profits, to which Defendants are entitled to a much larger share than Plaintiffs.  See Ex. 8; Ex. 10 at § 1.3.8.

[15]	It is noteworthy that this "loan" of land profits from the LC Partnership to the Creek Road Partnership occurred after the inception of the instant litigation.  Put simply,

(continued...)

In light of the foregoing, no issue of fact remains with respect to the various actions the Count I Defendants have taken in contravention of their duties of full disclosure and entire fairness.  Thus, summary judgment should be entered against the Count I Defendants with respect to Plaintiffs' breach of fiduciary duty claim.

### C.     General Land Partners, Tracy Mignatti, And Ted Mignatti, Jr. Are Liable For Breach Of The LC Agreement.

The elements for a breach of contract claim are set forth in section A, supra.  For the reasons that follow – reasons which echo the discussions in sections A and B above – each of the elements of Plaintiffs' claim that General Land Partners, Tracy Mignatti, and Ted Mignatti, Jr. (the "Count III Defendants") breached the LC Agreement is satisfied here, and no genuine issues of material fact remain with respect to that claim.

### 1.     The Count III Defendants Were Bound By The Terms Of The LC Agreement.

The LC Agreement is a written contract, and the parties to it are not in dispute. See Ex. 11; Ex. 7 at p. 6 (showing that Tracy Mignatti succeeded Ted Mignatti, III as a party to the agreement and a shareholder in the LC Partnership).  Defendants agree that the LC Partnership and the Agreement through which it was formed came about in order to effectuate the terms of the Bucks County Agreement.  See Ex. 9 at § 4(e); Answer, Countercls. ¶¶ 8 & 12. Once again, General Land Partners is plainly bound by the contractual duties imposed upon the general partner of the LC Partnership.  See Ex. 7 at pp. 5-6; Ex. 11 at § 1.04.  And, as set forth above in Section A, the remaining Count III Defendants are subject to the same contractual duties in light of their participation in the day-to-day functions and oversight of General Land

_____

(...continued)
        Defendants have continued to violate their fiduciary duties even after a claim for breach of fiduciary duty was alleged by Plaintiffs and brought before this Court.

Partners.  <u>See</u> Ted Mignatti dep., Ex. 2 at p. 9 line 4 – p. 10 line 9; <u>see also</u> <u>Wicks</u>, 470 A.2d at 90.

The essential terms of the LC Agreement which created obligations that are binding on the Count III Defendants include:

(i)    the duty to manage and control the affairs of the Partnership, including the purchase and sale of real property, <u>see</u> Ex. 11 at §§ 4.01 & 4.02;

(ii)   the duty to distribute land profits in accordance with the partners' shares set forth in the LC Agreement, <u>see</u> <u>id.</u> at "Exhibit A;" and

(iii) an implicit duty to exercise these obligations in a manner that is consistent with the general partner's fiduciary duty and its duty of good faith and fair dealing, <u>Kaplan v. Cablevision of Pa., Inc.</u>, 671 A.2d 716, 722 (Pa. Super. Ct. 1996).

## 2.    The Count III Defendants Breached The LC Agreement.

For reasons similar to those discussed with respect to Counts I and II of the Amended Complaint, the Court should conclude that the LC Agreement was breached by the Count III Defendants.  Briefly, the Bucks County Land was transferred from the LC Partnership to the Creek Road Partnership in 2006.  Plaintiffs are limited partners in the former, but have no interest in the latter.  Defendants, however, control both partnerships and, indeed, share ownership of the Creek Road Partnership with no one.  Defendants controlled the transfer of the Bucks County Land, and they unilaterally set a per-lot value that was less than one-third of the appraised fair market value of the land.

In so doing, Defendants ignored their obligations as general partners in the LC Partnership by reducing the land profits that would flow to Plaintiffs as a result of the transfer and failing to protect the interests of the limited partners.  The Count III Defendants breached both the explicit and implicit terms of the LC Agreement by their failure to act in good faith and

ensure that Plaintiffs' interests were fairly protected.  See Kaplan, 671 A.2d at 722 (noting Pennsylvania's adoption of section 205 of the Restatement (Second) of Contracts, which states that an implied duty of good faith and fair dealing is imposed by every contract).  As such, summary judgment should be entered with respect to Count III as well.

### D.  McKenna And The Corporate Defendants Tortiously Interfered With The Bucks County Agreement.

Under Pennsylvania law, the elements of a claim for tortious interference with contractual relations are:  (i) the existence of a contract or a prospective contractual relationship between the plaintiff and a third party; (ii) purposeful action taken by the defendant, specifically intended to harm or prevent the existing or prospective relationship; (iii) the absence of privilege or justification for the defendant's action; and 4) actual legal damage resulting from the defendant's conduct.  Flynn v. Health Advocate, Inc., No. 03-3764, 2004 WL 41929, at *8 (E.D. Pa. Jan. 13, 2004).

Here, McKenna, General Land Partners, Creek Road Partnership, and Creek Road Corporation (the "Count IV Defendants") – none of which were parties to the Bucks County Agreement – have undertaken to harm the contractual relationship described in the August 9, 1994 letter, and have damaged Plaintiffs in the process.  No genuine issues of material fact remain with respect to this claim, as the following discussion demonstrates.

### 1.  Alpart, Dan Kerrane and Ted Mignatti, III, Were Parties To The Bucks County Agreement.

At the risk of belaboring the point, there is no longer any dispute that there was a 1994 agreement among Alpart, Dan Kerrane and Ted Mignatti, III to purchase and develop land in Bucks County.  It is also undisputed that the original terms of the Bucks County Agreement – and, as Plaintiffs have demonstrated already, those original terms have not been validly changed and continue to govern the parties today – were summarized in the August 9, 1994 letter and

33

Warwick Greens Document, both of which were prepared by Ted Mignatti, III.  Those terms, once again, are:

> (i)      Alpart and Dan Kerrane were to invest capital to cover "up front" acquisition costs of the Bucks County Land.
>
> (ii)      In exchange for their capital contributions, Alpart and Dan Kerrane were to receive a return of their capital contributions, fifty percent of the "land profits" from the resale of the land, and twenty-five percent of the "building profits" if the land were resold to and developed by a Mignatti related entity.
>
> (iii)      If resold to a Mignatti related entity, "a fair market value for the ground [would] be established" to determine the transfer price and the basis for the split of land profits.

See Ex. 8; Ex. 10 at § 1.3; Ex. 9 at § 4(e); McKenna dep., Ex. 1 at p. 119, lines 5-15; Ted Mignatti dep., Ex. 2 at p. 25 line 2 – p. 28 line 7.

There is no dispute that the Count IV Defendants were not parties to the Bucks County Agreement.[16]  Accordingly, those defendants can properly be held liable for actions taken by them to interfere with the Bucks County Agreement.[17]

---

[16]      Defendants contend that Ted Mignatti, Jr. was a party to the Bucks County Agreement. Because Plaintiffs assert – and will prove – that he was not a party to that agreement, the success of Count IV with respect to Ted Mignatti, Jr. depends upon a fact that is currently in dispute.  Therefore, Plaintiffs are only moving for summary judgment on Count IV with respect to the remaining defendants named therein – McKenna, General Land Partners, Creek Road Partnership and Creek Road Corporation.

[17]      Plaintiffs' tortious interference claim against Creek Road Partnership and Creek Road Corporation are ripe for summary judgment based on the actions taken by Steve McKenna, who controls the day-to-day operations of both entities and is the sole officer for Creek Road Corporation.  See Ex. 7 at p. 4; Ted Mignatti dep., Ex. 2 at p. 13, lines 1-16; McKenna dep., Ex. 1 at p. 29 line 23 – p. 30 line 5.  When he engaged in the tortious interference described in this section, McKenna was acting on behalf of both Creek Road Partnership and Creek Road Corporation to maximize their profits and minimize the price they would pay for the Bucks County land.

### 2. The Count IV Defendants Tortiously Interfered With The Bucks County Agreement And Did So Without Justification.

The undisputed facts developed during discovery demonstrate that the Count IV Defendants unilaterally changed the terms of the Bucks County Agreement insofar as they involve the distribution of building profits. Although the Bucks County Agreement specifically provided that twenty-five percent of any building profits should go directly to "Kerrane & Alpart," see Ex. 8, the Count IV Defendants have unambiguously declared their intention to distribute the twenty-five percent share of the building profits to the LC Partnership. See Ex. 9 at § 4(e)(1)(4)(b)(ii); Ex. 6 at p. 8 no. 13. Such distribution will reduce the shares received by Plaintiffs by half, as the profits will be split among all partners to the LC Partnership – including Ted Mignatti, Jr. and Tracy Mignatti.

This attempt to modify the terms of the Bucks County Agreement occurred when McKenna assumed control over the various entities involved, after the death of Ted Mignatti, III. However, as discussed previously, see Section A.2, supra, there is no writing demonstrating that all parties to the original agreement consented to such a modification. See McKenna dep., Ex. 1 at p. 138 line 20 – p. 140 line 6. Further, the Count IV Defendants have not claimed – and could not truthfully claim – that an oral agreement to modify the contract was ever expressed by all parties to the Bucks County Agreement. Id. The only documents to which the Count IV Defendants point to support their contention that the Bucks County Agreement was changed with regard to payment of building profits are a series of ambiguous "investment summaries" prepared by McKenna to summarize his own understanding of the parameters of various land deals crafted by Ted Mignatti, III prior to his death. See id.; Ex. 9 at § 4(e); Ex. 18 at § 4(e). Accordingly, as a matter of law, the Bucks County Agreement was not modified. See Trombetta, 907 A.2d at 558; Raiken, 582 A.2d at 13.

35

The efforts undertaken by the Count IV Defendants to alter the terms of the Bucks County Agreement constitute interference with that agreement.  The modification that the Count IV Defendants seek to impose upon the Bucks County Agreement would undeniably increase Defendants' own share of the profits generated from the development of the Bucks County Land (by returning additional building profits to General Land Partners, Ted Mignatti, Jr. and Tracy Mignatti, via distribution to the LC Partnership), while substantially and impermissibly decreasing Plaintiffs' share in those profits (by cutting them in half and distributing the rest to the remaining partners in the LC Partnership).  See McKenna dep., Ex. 1 at p. 125 line 21 – p. 127 line 5.

Defendants can offer no justification for unilaterally imposing their own terms upon the Bucks County Agreement, without Plaintiffs' consent, especially when those terms will directly harm Plaintiffs by reducing their share in the building profits.  Indeed, Defendants' practice of taking measures to maximize their own profits at the expense of Plaintiffs' interests is even more evident when viewed in the context of the determination made by the very same decision-makers – including McKenna – that the Bucks County Land should be transferred to the Creek Road Partnership at a value that was substantially lower than the appraised fair market value of the land.  Under any interpretation of the Bucks County Agreement, the land was to be transferred at a value set by a third party (i.e., an appraiser's fair market value), or at a value to which all parties agreed.  See Ex. 8; Ex. 10 at § 1.3.8; McKenna dep., Ex. 1 at p. 164 line 7; id. at p. 168 line 24 – p. 169 line 4; id. at p. 154 line 16 – p. 155 line 2.

In other words, Defendants took affirmative steps to unilaterally reduce Plaintiffs' shares of both the land profits and the building profits flowing from the Bucks County Agreement, despite the fact that such profits were the very consideration given in exchange for

36

Plaintiffs' initial promise to pay the costs of acquiring the Bucks County Land in the first instance.  <u>See</u> Ex. 8.  Thus, the undisputed facts demonstrate that the Count IV Defendants interfered with the terms of the Bucks Count Agreement, and that they did so with no justification beyond their interest in maximizing their own personal financial gain.  As such, summary judgment should be entered against them with respect to Count IV.[18]

**E.    Plaintiffs Are Entitled To A Declaration That They Should Receive 25% Of Any Building Profits When Such Profits Are Realized.**

Declaratory judgment is appropriate under Pennsylvania law when a plaintiff can demonstrate the following elements:  (i) that the parties' interests are adverse; (ii) that a judicial judgment would be conclusive; and (iii) that a judgment would be of practical utility to the parties.  <u>Philadelphia Fed. Of Teachers v. Ridge</u>, No. 96-8051, 1997 WL 364397, at *6 (E.D. Pa. June 20, 1997).  In light of the discussion set forth in the foregoing sections, it is beyond apparent that Plaintiffs satisfy those elements and are entitled to the declaration they requested in Count VIII of their Amended Complaint.

---

[18]    Plaintiffs' tortious interference claim is not barred by the economic loss doctrine, as Defendants have suggested previously in their motion to dismiss the Amended Complaint, because Defendants' actions were intentional and were undertaken to harm Plaintiffs' business relationships.  <u>See</u> <u>Valley Forge Convention Center & Bureau v. Visitor's Servs., Inc.</u>, 28 F. Supp. 2d 947, 951 (E.D. Pa. 1998) ("Conduct by which a defendant breaches a contract . . . may also support a tortious interference claim if it is undertaken with the intention of injuring the plaintiff's business relationships."); <u>Aikens v. Baltimore & Ohio R.R. Co.</u>, 501 A.2d 277 (Pa. Super. Ct. 1985) (emphasizing that "recovery for purely economic loss occasioned by tortious interference with contract or economic advantage is . . . available . . . if the tortious interference was intentional").  Furthermore, the gist of the action doctrine does not bar a tortious interference claim where it is brought against defendants who are not parties to the contract at issue.  <u>Cf.</u> <u>eToll, Inc. v. Elias/Savion Advertising, Inc.</u>, 811 A.2d 10, 20 (Pa. Super. Ct. 2002) (finding that a breach of contract claim may not be recharacterized into a tortious interference claim when brought by a contracting party against another contracting party).

It is clearly beyond dispute that the parties' interests here are, to put it mildly, adverse.  Plaintiffs have an interest in receiving the full share of building profits allocated to them under the terms of the Bucks County Agreement.  Defendants, on the other hand, have an interest in rewriting history, attempting to unilaterally amend the relevant terms of that contract after the fact, and maximizing their own profit shares.

A declaration by this Court that Plaintiffs are entitled to a full 25% of any building profits – rather than half of that amount, which is what Defendants seek to provide by promising to distribute profits to the LC Partnership – will conclusively define the rights of the parties and foreclose any further disputes with respect to the "building profits" term of the Bucks County Agreement.  Accordingly, and for all of the reasons fully set forth in sections A through D of this Memorandum, Plaintiffs are entitled to a declaration that the Bucks County Agreement obligates Defendants to distribute 25% of any building profits directly to Plaintiffs, and not through the LC Partnership.

### F.    The Undisputed Facts Fail To Establish That Plaintiffs Breached Any Covenant Of Good Faith And Fair Dealing.

Under Pennsylvania law, a party claiming a breach of an implied or express covenant of good faith and fair dealing must establish the elements of a breach of contract claim.  See CRS Auto Parts, Inc. v. Nat'l Grange Mut. Ins. Co., 645 F. Supp. 2d 354, 369 (E.D. Pa. 2009); see also Donahue v. Fed. Express Corp., 753 A.2d 238, 242 (Pa. Super. Ct. 2000) (explaining that there is no independent cause of action in Pennsylvania for breach of the implied duty of good faith without an underlying breach of contract).  Defendants Ted Mignatti, Jr., Tracy Mignatti and General Land Partners (or "Counterclaim Plaintiffs") cannot establish those elements, which are set forth above in Section B.  Although Plaintiffs (or "Counterclaim Defendants") agree that two contracts exist – the Bucks County Agreement and the LC

Agreement – there is no basis for finding that Counterclaim Defendants breached either contract, or that Counterclaim Plaintiffs have suffered the requisite harm.

In order to prevail on their counterclaim, Counterclaim Plaintiffs must demonstrate that Counterclaim Defendants somehow breached one or both of the contracts that bind the parties here. When asked during their depositions to articulate their theory of precisely how Counterclaim Defendants breached the agreements, however, the only response any of the Counterclaim Plaintiffs could give was the fact that Counterclaim Defendants filed the instant lawsuit. See Ted Mignatti dep., Ex. 2 at p. 126 line 14 – p. 128 line 9; McKenna dep., Ex. 1 at p. 349 line 7 – p. 350 line 19; Tracy Mignatti dep., Ex. 3 at p. 149 line 5 – p. 151 line 17. Similarly, the only "damages" to which Counterclaim Plaintiffs could point were counsel fees that have been incurred in the course of this litigation, and the time and attention that defending this litigation has required of Counterclaim Plaintiffs. Id.

It goes without saying that a plaintiff who perceives that he has been harmed by the actions of another may file a non-frivolous lawsuit aimed at vindicating his rights, and not at maliciously harming the defendant. The Mignattis, as Counterclaim Plaintiffs – point to no provision of any agreement suggesting Kerrane, or the GST Trust as his successor, or Alpart agreed to forego their right to litigate any disputes arising under the relevant contracts. Their suggestion, then, that a contractual agreement includes an implied covenant not to sue for breach is frivolous. Indeed, here, all of Counterclaim Defendants' claims asserted in the Amended Complaint were permitted to survive a motion to dismiss and allowed to proceed through discovery. See Aug. 19, 2008 Order, doc. no. 51. None were deemed frivolous or without any legal merit. Id. Unless and until such a determination were made with respect to this suit in its entirety – and, for all of the reasons discussed in the preceding sections of this Memorandum of

Law, Counterclaim Defendants are confident that no such determination will ever be made – any legal claims premised on the "damage" resulting from being sued and incurring counsel fees are premature at best.

Accordingly, the claim asserted by Counterclaim Plaintiffs in Count II of their Answer to Amended Complaint with Affirmative Defenses and Counterclaims is legally and factually unsupported, and summary judgment should be entered in favor of Counterclaim Defendants.

## V.      CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that their Motion for Partial Summary Judgment be granted, and that judgment be entered in their favor, as set forth in the Proposed Order accompanying their Motion, with respect to Counts I through IV and Count VIII of the Amended Complaint, as well as Count II of Defendants' Answer to Amended Complaint with Affirmative Defenses and Counterclaims.

Respectfully submitted,

Date:   February 26, 2010

/s/ Stephen J. Kastenberg
Stephen J. Kastenberg
Jeffrey S. Rosenblum
Amy Shellhammer
Pa. ID Nos. 70919, 28809 & 91804
kastenberg@ballardspahr.com
rosenblumjs@ballardspahr.com
shellhammera@ballardspahr.com
BALLARD SPAHR LLP
1735 Market Street, 51st Floor
Philadelphia, PA 19103
(215) 665-8500 (phone)
(215) 864-8999 (facsimile)

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this date I served a copy of the foregoing Motion for

Partial Summary Judgment, the accompanying Memorandum Of Law, and the related Appendix

upon below-listed counsel by ECF and such document is available for viewing and downloading

on the ECF system:

> Mary Ellen O'Laughlin, Esq.
> Klehr, Harrison, Harvey, Branzburg & Ellers, LLP
> 260 South Broad Street
> Philadelphia, PA 19102
> (215) 569-2516
> *Attorney for Defendants*

Dated: February 26, 2010                    /s/ Amy Shellhammer
                                            Amy Shellhammer